# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01192-COA

GALAUNDRA MYLES                                    APPELLANT

v.

TYRONE LEWIS A/K/A TRONE LEWIS                     APPELLEE

DATE OF JUDGMENT:            10/25/2022
TRIAL JUDGE:                 HON. GEORGE WARD
COURT FROM WHICH APPEALED:   ADAMS COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      TRAVIS T. VANCE JR.
ATTORNEY FOR APPELLEE:       RICK D. PATT
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
DISPOSITION:                 AFFIRMED IN PART; REVERSED AND
                             REMANDED IN PART - 06/04/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Galaundra Myles filed a paternity action against Tyrone Lewis in the Adams County Chancery Court seeking past and future child support and payment of other expenses for her daughter, JDM.[1]  The chancery court determined Lewis to be JDM's father and granted Myles custody and Lewis visitation.  The court ordered Lewis to pay past and future child support, and half of the child's medical and dental expenses not covered by insurance.  However, the court did not require Lewis to pay for the other items Myles requested or for her attorney's fees.

¶2.     Myles appeals and argues (1) that the monthly amount of support ordered by the court

---

[1]  We use initials for privacy reasons.

is too low, (2) that the chancery court failed to make a finding on the amount of income Lewis had and, thus, erred in assessing the amount of past child support, (3) that the chancery court erred in not requiring Lewis to pay half of the child's private school tuition, half of her medical insurance premiums, and half of JDM's extracurricular activity fees, and (4) that the court erred in failing to award Myles reimbursement for her attorney's fees. On appeal, Lewis has filed a motion for payment of his attorney's fees. Having considered the arguments of the parties as well as relevant precedent, we affirm the chancery court's judgment in part, reverse it in part, and remand for further proceedings. In addition, we deny Lewis's motion for attorney's fees on appeal.

## Facts

¶3. Myles and Lewis lived together off and on for several years until 2021. Together, they had two children. The older child was over the age of twenty-one when Myles filed the paternity action on November 1, 2021, to establish that Lewis was the father of her younger, fourteen-year-old daughter, JDM.[2] Of Lewis's ten children, four, including JDM, were minors, but he was under court order to pay $200 per month support for only one child. Lewis said this other child turned twenty-one years old in December 2022, and he (Lewis) was almost finished paying the back child support he owed for that child.

¶4. Lewis had been a self-employed truck driver since 2013. He did business as Lewis Trucking LLC, and his Rule 8.05 financial statement filed in June 2022 showed he claimed

_____

[2] According to Myles, she had filed an application with the Mississippi Department of Human Services in 2017 to obtain child support for JDM. However, MDHS did not serve Lewis, and the case was dismissed.

2

his gross personal income of $1,733.34 per month. *See* UCCR 8.05. Lewis testified that he calculated this amount by taking his 2021 adjusted gross taxable income of $24,464, dividing it by twelve to get roughly $2,000 per month, and then subtracting the $200 per month court-ordered child support payment. On the Rule 8.05 statement, he listed living expenses of $1,804.67, including the $200 court-ordered child support payment. Lewis testified that he paid all his living expenses through the business account and that he also wrote himself a check for $400 per week from that account.

¶5. During the pre-trial proceedings, Myles sought to verify Lewis's income and expenses by requesting him to produce bank statements, tax returns, checks, ledgers, and titles to any asset for the last two years. When Lewis failed to provide this information, Myles filed a motion to compel. At the hearing on her motion, the court granted Myles the relief she sought but ultimately allowed Lewis's attorney to withdraw.[3] Lewis retained new counsel on August 30, 2022, a month before trial.

¶6. Lewis provided tax returns for 2020 and 2021. In 2020, his business reportedly grossed $68,623. But after expenses totaling $57,992, Lewis's preliminary net profit was $10,631. He then deducted expenses for the use of his home in his business and his final net business profit was $9,131. However, on the tax return, he reported personal income of $8,161, deducted the standard exemption, and paid no taxes that year. On his 2021 tax return, Lewis reported gross business income of $76,742, with $52,247 in expenses, and net

_____

[3] Although no formal order on the motion to compel appears to have been entered, the transcript of the hearing reflects that the court clearly granted the motion to compel and ordered Lewis to produce the material within thirty days. Lewis was represented by counsel at that hearing.

business income of $24,494.[4] Lewis reported this $24,494 as his personal income, and after deductions, he calculated taxable income at $8,170. But his return reflected that Lewis owed over $4,000 in federal taxes. These figures did not include the $92,000 PPP loan that Lewis received from the federal government in 2021.[5]

¶7.     Myles obtained eight months of bank statements (January through September 2022) through a subpoena to Lewis's bank. Lewis admitted that the January 2022 statement included a personal withdrawal of $23,000. Lewis said that he owed this to his family but he gave no explanation of why. He also withdrew $18,989 in April 2022 and $10,000 in May 2022. Lewis said that these amounts were to pay back loans "for the business." But he provided no specifics about these loans—when they were made, who was owed, and for what—nor did he provide any documentation of these loans or his alleged pay-offs. The eight months of 2022 bank statements reflected gross income to his business account of $150,802.45 through September 23, 2022.

¶8.     Lewis claimed that his business expenses were high. As an example, he said that insurance on his truck cost $1,300 per month after an additional annual payment of $2,500. Gas had risen from $2 to $5.36 per gallon. However, Lewis also paid all of his personal expenses through his business account, which included purchases of furniture, clothes, child support, groceries, and payment of his utility bill. Lewis also admitted that a few months

---

[4] Lewis made no deduction for the use of his home in his business in 2021.

[5] The Paycheck Protection Program was an SBA-backed loan that helped businesses during COVID-19. Lewis's PPP loan amount is not reflected in any document entered into evidence and only testified to by Lewis.

before trial, he had borrowed $45,000 from Ford Motor Credit to purchase a 2022 Ford Expedition. He said he bought this vehicle for one of the mothers of his other children who needed transportation. Lewis said that she pays him half of the $771 monthly note that is being drafted from his business account. He said this purchase was not reflected in his Rule 8.05 financial statement in June 2022 because he bought the vehicle after he filed his statement.

¶9. Myles worked at Alcorn State University as Director of Academic Support and Facilities. Her Rule 8.05 financial statement reflected a gross monthly income of $3,862.50 and a net monthly income of $2,704.44. Myles totaled her living expenses, including JDM's expenses for private school, at $4,814. Myles paid a monthly premium of $114.00 for medical insurance on JDM, which is deducted by her job from her gross earnings.[6] Myles also paid $25 per month for the child's asthma medication. Other expenses for the child that Myles listed on the Rule 8.05 financial statement included JDM's school and sports expenses (detailed below). In addition, Myles said JDM needed braces that cost $2,800. Myles said Lewis told her that he would pay for these, but he did not and Myles was paying $295 per month on this bill.[7] Myles also paid $100 per week for JDM to see a counselor for behavioral problems, and she gave JDM an allowance of $100 per month.

¶10. JDM had attended private school when she was younger and then public school from

---

[6] Myles said this was not part of the personal major medical insurance policy she had through her employer. Rather, it was a premium that she paid for a separate medical policy for JDM, which was cheaper than adding family coverage to her own work-related policy.

[7] Myles said she was delinquent on her payments, which meant that JDM could not see the dentist for her regular follow-up appointments.

the fifth to the eighth grade. Just before the hearing, Myles enrolled the child in Adams County Christian School where she was active in sports, especially softball and basketball. Myles testified that she moved the child because JDM was very athletic and that she was not receiving the coaching in public school that she needed to reach the next level to get a scholarship to college. The school recruited JDM for her athletic ability but did not provide any scholarship and did not transport athletes to and from games. Myles said that her parents and siblings paid the $6,200 tuition but that she planned to pay them back when she received her tax return. In addition to the $550 registration for school, Myles paid a $100 workbook fee and $600 per year for uniforms. Altogether, the total costs averaged $820 per month. On her Rule 8,05 financial statement, Myles also said she paid $155 per month for JDM's extracurricular activities. JDM also participated in a travel softball team, the Diamond Dolls, for which Myles paid $400 per month for travel to and from games and tournaments. This team traveled around the state, as well as to Louisiana and Alabama. Myles also said she had to borrow money from her brother to file this action and she had incurred a $1,200 bill for attorney's fees. She asked the court to order Lewis to reimburse her for this expense.

¶11. Lewis testified that neither he nor Myles could afford private school and that he did not agree to JDM's enrollment at Adams Christian. In his opinion, a private school did not necessarily offer a better education than a public school. He said this because JDM had gone to private school up to the fourth grade, but when he downloaded a worksheet for JDM to complete, she could not answer the questions. Yet the private school was giving her As and Bs. Lewis said that is when he stopped helping to pay for private school and JDM went to

6

public school.  He also said that if he were ordered to pay hundreds of dollars a month for private school, he would go out of business.

¶12.    According to Myles, over the child's lifetime, Lewis provided little to no support, noting Lewis's purchases of four or five pairs of tennis shoes and payment of small sums of money ($100 once or twice) and on one occasion $500 for school uniforms.  Lewis pointed out that the couple lived together off and on over the years and that he had contributed to the household and supported JDM during those times.

¶13.    The chancery court tried the matter on September 29, 2022.  The parties stipulated that Lewis was JDM's father,[8] and only Myles and Lewis testified.

¶14.    On October 25, 2022, the chancery court issued its judgment.  The chancery court adjudicated Lewis to be JDM's father and awarded the child's custody to Myles with specific visitation to Lewis.  The court considered Lewis's monthly draw of $1,600 (the four $400 checks he wrote himself each month) as income in addition to the $1,730 Lewis claimed in his Rule 8.05 financial statement.[9]  But the court reduced the $1,600 to $1,120 to account for state and federal taxes and calculated Lewis's child support obligation based on a monthly income of $2,850 ($1,730 plus $1,120).  Using the statutory percentage for one child (14%), the court ordered Lewis to pay $399.00 per month in future support.  Based on that monthly amount, the court further ordered Lewis to pay $4,788 for one year's back child support.  The chancery court did not order Lewis to pay for JDM's private school tuition or for the child's

_____

[8] DNA testing performed in January 2022 resulted in a 99.9999999% probability that Lewis was JDM's father.

[9] Lewis actually claimed $1,733.34 as monthly income on his financial statement.

7

extracurricular activities. The court required Lewis to pay half of the medical and dental expenses not covered by insurance, including dental and braces.

¶15. Myles appeals, arguing that the monthly amount of support is too low, that the chancery court failed to make a finding on the amount of income Lewis had and thus erred in assessing the amount of back child support, that the chancery court erred in not requiring Lewis to pay half of the private school tuition, pay half of the insurance premiums, and pay half of the child's extracurriculars, and erred in failing to award Myles her attorney's fees. In his brief, Lewis contends that Myles is precluded from arguing these issues on appeal because she filed no motion for reconsideration. In addition, Lewis has moved for payment of his attorney's fees.

**Standard of Review**

¶16. "The award of child support is a matter within the discretion of the chancery court, and it will not be reversed unless the chancery court was manifestly wrong in its finding of fact or manifestly abused its discretion." *Capocaccia v. Capocaccia*, 372 So. 3d 1106, 1116 (¶26) (Miss. Ct. App. 2023) (quoting *Green v. Green*, 349 So. 3d 1187, 1201 (¶51) (Miss. Ct. App. 2022)). "Manifest error is that error which is unmistakable, clear, plain, or indisputable." *Collins v. Collins*, 112 So. 3d 428, 431 (¶8) (Miss. 2013) (citing *Magee v. Magee*, 661 So. 2d 1117, 1122 (Miss. 1995)). We review questions of law de novo. *Capocaccia*, 372 So. 3d at 1115 (¶22).

**Discussion**

I.      **Whether Myles is procedurally barred from raising her issues on appeal.**

8

¶17.   Lewis contends that Myles is procedurally barred from raising any issues on appeal because she did not file a post-trial motion with the chancery court or request the court to reconsider its ruling.  Lewis cites *Ainsworth v. Ainsworth*, 139 So. 3d 761 (Miss. Ct. App. 2014), and *Massey v. Massey*, 148 So. 3d 35 (Miss. Ct. App. 2014), as support.  However, in both of those cases, the appealing parties had filed Rule 59 post-trial motions with the trial court and were attempting to raise other new issues on appeal.[10]  See M.R.C.P. 59.  These cases are inapplicable here because Myles did not file a post-trial motion on any issue.  Moreover, because the chancery court had dealt with all issues in its final judgment, she was not required to file a post-trial motion.  *Baumbach v. Baumbach*, 242 So. 3d 193, 199 (¶20) (Miss. Ct. App. 2018); *see also Jackson v. State*, 423 So. 2d 129, 131 (Miss. 1982) ("[I]t is not necessary to make a motion for a new trial grounded upon errors shown in the official transcript of the record, including the pleadings, transcribed evidence, instructions, verdict[,] and judgment of the court.").  In *Kiddy v. Lipscomb*, 628 So. 2d 1355, 1359-60 (Miss. 1993), even though the appellant had filed a post-trial motion, the Mississippi Supreme Court held that "a motion for a new trial is only necessary to bring to the attention of the trial court matters not embraced in the rulings during the trial."  The supreme court found this view to

_____

[10]   In the *Ainsworth* divorce action, the husband filed a motion for reconsideration that the chancellor had erroneously considered income from a vehicle sale in calculating support.  *Ainsworth*, 139 So. 3d at 765 (¶16). On appeal, the husband also argued that the chancellor had erroneously considered his yearly bonus in its calculation, but he did not raise this in his motion to reconsider.  *Id*.  Finding this issue was raised for the first time on appeal, we found the husband's argument procedurally barred.  *Id.*  Similarly, in the *Massey* divorce case, the wife filed a motion to alter or amend the court's judgment concerning the amount of support her husband was ordered to pay.  *Massey*, 148 So. 3d at 37 (¶6). However, she did not raise this issue in her post-trial motion, and we held the issue was procedurally barred from consideration on appeal.  *Id.*

9

be consistent with the interpretation of the essentially identical Federal Rule of Civil Procedure 59:

> The settled rule in federal courts, contrary to that in many states, is that a party may assert on appeal any question that has been properly raised in the trial court. He is not required to make a motion for a new trial challenging the supposed errors as a prerequisite to appeal.

*Kiddy*, 628 So. 2d at 1360 (citing 11 Wright & Miller, Federal Practice and Procedure, § 2812).

¶18. We followed the *Kiddy* ruling in *Baumbach*. In that divorce case, the wife contended that the husband was procedurally barred from arguing the issue of custody on appeal because he did not address it in his motion to amend the judgment. *Baumbach*, 242 So. 3d at 199 (¶20). We disagreed and quoted *Kiddy*, stating:

> Although it is clearly the better practice to include all potential assignments of error in a motion for new trial . . . when the assignment of error is based on an issue [that] has been decided by the trial court and duly recorded in the court reporter's transcript, . . . [an appellate court] may consider it regardless of whether it was raised in the motion for new trial.

*Id*. (quoting *Kiddy*, 628 So. 2d at 1359). We proceeded to consider the issue of child custody because it "was clearly decided by the chancery court at trial." *Id*. Similarly, in this case, the chancery court clearly decided the issues of child support and payment of JDM's expenses and Myles's attorney's fees in its final judgment and Myles is not procedurally barred from raising those issues on appeal.

**II.    Whether the chancery court erred in computing the amount of monthly child support.**

¶19. Mississippi Code Annotated section 43-19-101 (Rev. 2021) sets forth the guidelines

10

for a chancellor to follow to calculate child support. Provisions of the statute relevant to this case include:

> (1) The following child-support award guidelines shall be a rebuttable presumption in all judicial or administrative proceedings regarding the awarding or modifying of child-support awards in this state:

| Number of Children Due Support | Percentage of Adjusted Gross Income That Should Be Awarded For Support |
|---|---|
| 1 | 14% |
| 2 | 20% |
| 3 | 22% |
| 4 | 24% |

> . . . .

> (2) The guidelines provided for in subsection (1) of this section apply unless the judicial or administrative body awarding or modifying the child-support award makes a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined under the criteria specified in Section 43-19-103.

> (3) The amount of "adjusted gross income" as that term is used in subsection (1) of this section shall be calculated as follows:

> > (a) Determine gross income from all potential sources that may reasonably be expected to be available to the absent parent including, but not limited to, the following: . . . ; income from self-employment;

> > (b) Subtract the following legally mandated deductions:

> > > (i) Federal, state and local taxes. Contributions to the payment of taxes over and beyond the actual liability for the taxable year shall not be considered a mandatory deduction;
> > > (ii) Social security contributions;
> > > (iii) Retirement and disability contributions except any voluntary retirement and disability contributions;

. . . .

(e) Compute the total annual amount of adjusted gross income based on paragraphs (a) through (d) of this subsection, then divide this amount by twelve (12) to obtain the monthly amount of adjusted gross income.

Upon conclusion of the calculation of paragraphs (a) through (e) of this subsection, multiply the monthly amount of adjusted gross income by the appropriate percentage designated in subsection (1) of this section to arrive at the amount of the monthly child-support award.

. . . .

¶20. "Deviations from the guidelines must be supported by written findings of fact." *Doe v. Doe*, 341 So. 3d 953, 977 (¶78) (Miss. Ct. App. 2021). Mississippi Code Annotated section 43-19-103 (Rev. 2021) sets forth the statutory reasons that may justify deviation from the guidelines, providing as follows:

The rebuttable presumption as to the justness or appropriateness of an award or modification of a child support award in this state, based upon the guidelines established by Section 43-19-101, may be overcome by a judicial or administrative body awarding or modifying the child support award by making a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined according to the following criteria:

(a) Extraordinary medical, psychological, educational or dental expenses.
(b) Independent income of the child.
(c) The payment of both child support and spousal support to the obligee.
(d) Seasonal variations in one or both parents' incomes or expenses.
(e) The age of the child, taking into account the greater needs of older children.
(f) Special needs that have traditionally been met within the family budget even though the fulfilling of those needs will cause the support to exceed the proposed guidelines.
(g) The particular shared parental arrangement, such as where the noncustodial parent spends a great deal of time with the children thereby reducing the financial expenditures incurred by the custodial parent, or the refusal of the noncustodial parent to become involved in the activities of the child, or giving due consideration to the custodial parent's homemaking services.

(h) Total available assets of the obligee, obligor and the child.

(i) Payment by the obligee of child care expenses in order that the obligee may seek or retain employment, or because of the disability of the obligee.

(j) Any other adjustment which is needed to achieve an equitable result which may include, but not be limited to, a reasonable and necessary existing expense or debt.

¶21. Chancery courts have used a variety of methods, based on the information presented, to determine adjusted gross income for child support purposes when a salaried individual's income changes from year to year.[11] However, more applicable to this case are those cases that have dealt with determining the adjusted gross income of self-employed individuals like Lewis. In such cases, the courts have examined the self-employed individual's tax returns and business income records to determine if the income claimed on the Rule 8.05 financial statement should be accepted and used to calculate child support. From an examination of these cases, several principles emerge that are relevant to the case at hand.

¶22. First, it is important that the trial court consider all evidence concerning income and expenses that the parties present. This was critical in *Collins v. Collins*, 112 So. 3d 428

---

[11] In *Burge v. Burge*, 851 So. 2d 384, 386 (¶4) (Miss. Ct. App. 2003), a husband worked as an oceanographer, and between 1990 and 2000, his income had increased over the years. *Id*. at (¶5). Rather than using the husband's higher earnings between 1997 and 2000, which reflected gross income for tax purposes exceeding $60,000, the chancery court fixed his adjusted gross income at $54,000. *Id*. This Court affirmed that for the first six months of the year in which the case was tried, the husband's gross income was $36,317.86, *id.*, which was consistent with the amount set by the chancery court. In another case, *Roberts v. Roberts*, 924 So. 2d 550 (Miss. Ct. App. 2005), a husband was a pharmaceutical salesman with a fluctuating income. *Id*. at 553 (¶5). The chancellor averaged the husband's income over three years (2000-2003) to determine the amount to use in calculating child support. *Id*. On appeal, the wife contended that the trial court failed to consider the husband's income from the previous years as well as his current year's income. *Id*. at 553 (¶6). However, this court noted that the chancellor is the trier of facts, and where those findings are supported by substantial credible evidence, we do not reverse. *Id*.

(Miss. 2013). There, the divorcing parties owned and operated three businesses including a childcare center run by the wife, a heating and air conditioning company (HVAC) run by the husband, and a company managing eight rental properties. *Id*. at 430 (¶2). The husband admitted that his Rule 8.05 financial statement was incorrect and contained omissions and that he could not submit tax returns because he had not filed any for the two years prior to trial. *Id*. at 430 (¶2). To evaluate the husband's business income from the HVAC business, the chancery court accepted the husband's testimony that in 2009, he deposited a total of $188,918.51 into the business account, but the trial court found "simply not credible" the husband's claim that the overhead of the business was $300,000. *Id*. at 433 (¶15). The chancellor then split the amount of deposits in half and considered the husband's income to be $94,459.75. *Id*. On appeal, we affirmed, *id*. at 431 (¶5), but the Mississippi Supreme Court reversed, stating that those same bank records showed business expenses such that the husband's income was "nowhere near" the amount set by the chancery court. *Id*. at 433 (¶16). The supreme court found that the chancery court was "manifestly wrong when she arbitrarily determined [the husband's] monthly income to the exclusion of the undisputed evidence he provided." *Id*. at (¶17). The supreme court held that "credible evidence related to [the husband's] heating and air conditioning business was ignored" and, for this and other reasons, the case was reversed and remanded for a new calculation of the husband's income. *Id*. at 434 (¶20).

¶23. Second, tax returns are critical and are examined with discerning eyes. The Mississippi Supreme Court has noted that although tax returns are one source of income

14

information, they are not necessarily determinative of gross income for purposes of child support. *Nix v. Nix*, 790 So. 2d 198, 200 (¶5) (Miss. 2001). A party may challenge, and the chancery court may consider, whether the expenses claimed are legitimate business expenses in ultimately determining a self-employed party's income available for payment of child support. *Id*. "Computing one's income for taxation is different than computing one's income for child support purposes. . . . Our statutes delineate what is to be considered as gross income for the purposes of computing child support." *Branch v. Branch*, 174 So. 3d 932, 940-41 (¶30) (Miss. Ct. App. 2015) (citing *Bustin v. Bustin*, 806 So. 2d 1136, 1140 (¶11) (Miss. Ct. App. 2001)).

¶24.    In *Holdeman v. Holdeman*, 34 So. 3d 650 (Miss. Ct. App. 2010), we reviewed a chancery court's calculation of support required of a self-employed individual by scrutinizing his tax returns. In that case, the husband owned a catfish-farming business and was the sole stockholder in a trucking and dirt-moving company. *Id*. at 651 (¶4). He claimed that his $55,000 annual management fee from the trucking company was his only income. *Id*. The chancery court calculated child support based on the husband's Rule 8.05 financial statement in which he claimed a net monthly income of $3,314. *Id.* at 652 (¶6). However, on appeal, we concluded that the husband's income was significantly higher. *Id.* at 653 (¶10). We examined several items on his tax return, including the $55,000 deduction for the management fee, $18,151.50 for depreciation on the farming operation, and $127,520 in depreciation for the trucking business. *Id.* at 654 (¶10). We noted that the husband provided no explanation for how this depreciation was calculated. *Id*. The bottom line was that the

husband's tax returns showed losses for both companies, *id.*, but despite this, we concluded that the husband still earned money and the question was how much. *Id.* at 654 (¶11). We remanded the case and instructed the chancellor to "carefully scrutinize [the husband's] tax returns to determine if there is any income that should be considered in arriving at [his] adjusted gross income, as specified in section 43-19-101(3)(a)." *Id.*

¶25. In addition, the chancery court should be cautious of personal expenses that may be commingled with business expenses. "Generally, self-employment income amounts to gross income less ordinary and reasonable expenses incurred in producing the income." *Faerber v. Faerber*, 13 So. 3d 853, 864-65 (¶43) (Miss. Ct. App. 2009). In *Faerber*, the chancery court determined that the family business, College Auto Park, was the husband's separate property. *Id.* at 856 (¶6). The chancery court accepted the husband's tax documents, which reflected self-employment income as $1,880, but the court did not consider the potential commingling of the husband's personal and business expenses, among other things. *Id.* at 864 (¶43). We reversed and remanded the case for the chancery court to determine if any commingling had occurred. *Id.* at 865 (¶44).

¶26. We have also held that a chancery court did not err when it included an additional amount in a husband's income to offset the large amounts he had withdrawn from his business account even though his tax return reflected much less income. In *Spahn v. Spahn*, 959 So. 2d 8 (Miss. Ct. App. 2006), the husband owned M&R Construction and Supply company, which he and his father had founded long before the husband married. *Id.* at 10 (¶2). The business grossed $1,421,973, but on his Rule 8.05 financial statement, the husband

claimed a net personal monthly income of only $2,796. *Id*. at 11 (¶5).[12] The husband also testified that in 2003 he had also withdrawn $50,302 and deposited it in his personal checking account. *Id*. at (¶6). The court then appointed a CPA and accountant who testified that according to the 2003 tax return, the husband had adjusted gross income of $45,248 and taxable income of $34,398. *Id*. The chancery court added another $500 per month to the husband's income, determining it to be $3,296.14, and then calculating the amount owed. *Id*. We found there was substantial credible evidence in the record that supported the income the chancery court found, including the husband's testimony, the accountant's testimony, the tax return, and the Rule 8.05 statement; we affirmed. *Id*. at (¶7).

¶27. Applying these principles to the case before us, we find there to be significant evidence in the record that the chancery court ignored when determining Lewis's adjusted net income that warrants reversal and remand. Although Lewis claimed that he based the monthly income that he reported on his Rule 8.05 financial statement on his 2021 tax return ($24,494), in that year his business grossed only $76,742.[13] However, his 2022 bank statements reflect a significant increase in his gross business income to $150,802.45 through only eight months of the year. Moreover, as in *Spahn*, Lewis admitted that he withdrew several large sums of money—$23,000; $18,989; and $10,000—during that time. He

---

[12] The wife contended that the husband took improper deductions for vehicle payments and entertainment expenses, but she offered no specific proof of the amounts of the alleged improper deductions. *Spahn*, 959 So. 2d at 11 (¶5).

[13] Even the income figure on Lewis's 2021 tax return is questionable because he admitted that he paid all his expenses—personal and business—through his business account.

17

claimed these were to pay his family back or to pay back loans "for the business." But he provided no specifics about these loans—when they were made, who was owed, and for what—nor did he provide any documentation of these loans and his pay-offs. The chancery court mentions nothing about this evidence.

¶28. In addition, as in *Collins*, Lewis admitted that his Rule 8.05 financial statement was inaccurate because it did not reflect the $771 per month payment that was being deducted from his business account for the purchase of a 2022 Ford Expedition. Moreover, it is undisputed that Lewis paid all his personal expenses through his business account. Thus his tax returns should be examined to account for this commingling of business and personal expenses. In summary, the chancery court's failure to address the significant increase in Lewis's income as reflected in his 2022 bank statements and his sizeable personal withdrawals, as well as the inaccuracy of Lewis's financial statement and his admitted commingling of personal with business expenses, amounts to manifest error and warrants a remand of this case to determine what funds Lewis actually has available to pay child support. Upon remand, the chancery court should consider not only the guidelines for determining child support in section 43-19-101, but also any of the statutory reasons for deviation found in section 43-19-103.

### III. Whether the chancery court erred in assessing the amount of back child support Lewis owed.

¶29. Because we are remanding the case for a reassessment of the amount of monthly child support Lewis should pay, we need not deal with the issue of the past child support that is owed. On remand, the chancery court should recalculate back child support based on the

18

amount of support it determines Lewis should pay in the future.

> IV. **Whether the chancery court erred in not requiring Lewis to pay half of JDM's private school tuition, pay half of the insurance premiums, and pay half of the child's extracurricular fees.**

> A. *Private School Tuition*

¶30. In most cases where the courts have imposed an obligation to pay private school tuition, the parties had both originally agreed to send their children to private school. For example, in *Bell v. Bell*, 206 So. 3d 1254, 1259-60 (¶11) (Miss. Ct. App. 2016), the husband testified that the child had attended private school "since day one" and that the parties had agreed in their irreconcilable differences custody and support agreement to factor the tuition payment into the child support amount. The father also testified at a later modification hearing that he wanted the child to continue to attend private school. *Id*. Similarly, in *Collins v. Collins*, 722 So. 2d 596, 599 (¶9) (Miss. 1998), the Mississippi Supreme Court noted that the parties had agreed that the child should continue to attend the private school.

¶31. "[P]rivate-school-tuition is considered part of child support." *Collado v. Collado*, 282 So. 3d 1239, 1242 (¶10) (Miss. Ct. App. 2019). However, in *Southerland v. Southerland* (*Southerland I*), 816 So. 2d 1004, 1007 (¶13) (Miss. 2002), the supreme court stated, "While a father's agreement prior to divorce to send a child to private school may be one legitimate factor to be considered, it is by itself an inadequate basis for an award of support in excess of that allowed by the statutory guidelines."[14] Likewise, in *Cupit v. Cupit*, 559 So. 2d 1035,

---

[14] The Supreme Court reversed and remanded in *Southerland I* for the chancery court to make specific findings if the amount set for child support deviated from the statutory guidelines. *Id*. On remand, the chancery court set the support award in excess of the guideline amount but made specific findings why it did so, among them being the father's

1037 (Miss. 1990), the supreme court stated that "the chancellor should consider the reasonable needs of the child as well as the financial resources and reasonable needs of each parent." In that case, the supreme court analyzed a truck-driver-husband's income and found that the $400 per month child support payment set by the chancellor to enable the children to attend private school was excessive. *Id*. at 1038. The Court also concluded that the chancellor had erred in finding that private school education was a reasonable need of the children in view of the parents' financial situation. *Id.* Although the primary concern is the best interest of the child, the Court stated,

> the chancellor should consider the reasonable needs of the child as well as the financial resources and reasonable needs of each parent. Above that, the chancellor is obliged to consider any other relevant fact shown by the evidence.

*Id*. at 1037. Even though the parents had agreed during the marriage that the children should go to private school, the information in the record showed a clear inability of the father to pay that much. *Id.*

¶32. Another factor the chancery court may consider is whether the child has special needs that require private schooling. For example, in *Smith v. Smith*, 318 So 3d 484, 488 (¶3) (Miss. Ct. App. 2021), the child was diagnosed with dyslexia and an expressive/receptive language disorder. The mother moved to Tennessee for the child to receive specialized care

---

desire that the child remain in private school. *Southerland v. Southerland* (*Southerland II*), 875 So. 2d 204, 205 (¶4) (Miss. 2004). The Supreme Court noted that the father wanted his daughter to remain in private school, that he was able to meet the expense because of his ability to earn a substantial income, and that the child had been enrolled in the private school since the family moved back to Mississippi. *Id*. at 207 (¶8). Therefore, the chancery court did not err or abuse its discretion in deviating from the guidelines. *Id*. at (¶10).

in a private school and filed a modification petition, seeking a change from joint to sole custody of the child and a modification of the father's child support obligation to help pay for the child's tuition. *Id*. at 487 (¶2). At the modification hearing, the mother presented evidence of the child's specific learning needs that could not be addressed in her current school. *Id*. at 491 (¶22). The director of curriculum of the child's current school admitted that a mainstream educational environment would not meet the child's needs. *Id*. Given the record, the supreme court affirmed the chancery court's determination that the child be enrolled in private school and that the father pay half of the tuition. *Id*. at (¶23).

¶33. In the case at hand, when JDM was younger, Lewis had agreed and allowed JDM to attend private school. But he later disagreed, contending that she was not getting any better of an education, and for several years, JDM then attended public school. At the time of the hearing, Myles had unilaterally decided to enroll the child back in private school over Lewis's objection. Myles argues that as the child's mother, who has raised JDM for fourteen years, her decision to send the child to private school should be respected and Lewis should be ordered to pay for half of its cost. However, Myles cites no authority for her position. In addition, Myles presented no testimony that JDM had special educational needs, as the child in *Smith* had, that required JDM to attend private school. In fact, Myles said JDM was an A/B student. Rather Myles stressed the need for JDM to receive better sports coaching. Under these facts, we find no error in the chancery court's decision that Lewis did not have to pay for JDM's private school tuition or any associated fees.

   B. *Half of Insurance Premiums*

21

¶34. Mississippi Code Annotated section 43-19-101(7) contains a provision specifically dealing with medical insurance coverage of a minor child:

> All orders involving support of minor children, as a matter of law, *shall* include reasonable medical support. Notice to the obligated parent's employer that medical support has been ordered shall be on a form as prescribed by the Department of Human Services. In any case in which the support of any child is involved, the court shall make the following findings either on the record or in the judgment:
>
> > (a) The availability to all parties of health insurance coverage for the child(ren);
> >
> > (b) The cost of *health insurance coverage* to all parties.
>
> The court shall then make appropriate provisions in the judgment for the provision of health insurance coverage for the child(ren) in the manner that is in the best interests of the child(ren). If the court requires the custodial parent to obtain the coverage then its cost shall be taken into account in establishing the child-support award. If the court determines that health insurance coverage is not available to any party or that it is not available to either party at a cost that is reasonable as compared to the income of the parties, then the court shall make specific findings as to such either on the record or in the judgment. In that event, the court shall make appropriate provisions in the judgment for the payment of medical expenses of the child(ren) in the absence of health insurance coverage.

(Emphasis added).

¶35. In *Holdeman*, 34 So. 3d at 652 (¶8), we reversed and remanded a chancery court's order of support because it failed to address the issue of the health insurance. The parties had testified about how the child's health insurance premium was paid prior to their divorce, but the order failed to state anything at all about how that premium payment would be handled in the future. *Id.* Likewise, in this case, the chancery court's final judgment failed to address the issue of payment of JDM's monthly $114 health insurance premium. Myles testified that

22

she had been paying it, and she asked the court to order Lewis to pay half. Lewis said he had

no problem with paying part of the insurance premium. However, the final judgment only

deals with the payment of medical costs not covered by insurance; it mentions nothing about

the payment of the health insurance premium. Because *Holdeman* specifically held that the

chancery court was required by the statute to deal with health insurance coverage, on remand,

the chancery court should address the issue of the payment of the premium for JDM's

medical insurance and fashion whatever arrangement the court feels proper under the

circumstances.

### C. Half of JDM's Extracurricular Fees

¶36.  In *Thomas v. Crews*, 203 So. 3d 701, 706 n.2 (Miss. Ct. App. 2016), this Court

clarified the meaning of "extracurricular activities," stating,

> Extracurricular is defined as "outside the normal curriculum." *Extracurricular*, The Oxford English Dictionary (2d ed. 1989). Extracurricular activities "are those sponsored by and usually held at school but that are not part of the standard academic curriculum."

In *Thomas*, a modification of child support case, the parties had originally entered into a

child-custody and support agreement in which they agreed to split the costs of the child's

"extracurricular activities," an undefined term. *Thomas*, 203 So. 3d at 703 (¶3). The child

played high school volleyball, but after the divorce she also joined a competitive volleyball

team. *Id*. at (¶4). In the subsequent modification proceeding, the chancellor increased the

father's child support obligation due to the father's increase in income. *Id*. at 704 (¶10). But

concerning the costs of the child's participation in competitive volleyball, even though the

parties had agreed to split the costs, the chancellor clarified that "extracurricular expenses

are those incurred through school. [S]chool volleyball is different than competitive volleyball[.] [I]f the Father wants to pay, that will be up to the Father." *Id.* at 706 (¶22). On appeal, we affirmed the chancellor's decision, citing the Oxford Dictionary definition above.

¶37. In this original paternity case, it is undisputed that JDM played basketball and softball at the private school she attended. According to her Rule 8.05 financial statement, Myles said she had to pay a $55 fee for basketball and $1,000 in fees for softball ($500 in the fall and $500 in the spring). She paid $600 per year for softball uniforms, $100 for cleats, and $100 for basketball shoes. JDM also played softball in an independent "traveling" team. Myles said that she spent $400 per month for "travel ball."

¶38. Because we have determined that Lewis did not have to pay for private school tuition, it follows that he should not have to pay any fees that the school imposed for JDM to play those sports, or Myles's expenses for transporting the child to and from school ball games.

¶39. Concerning the fees and expenses for JDM to participate in the independent softball team, we find nothing in the record indicating that Lewis had agreed to JDM's participation in this non-school-sponsored league, or that he had agreed to pay its costs. Myles specifically testified that she paid these expenses with her credit cards and had not asked Lewis to pay any of them. Nor in light of the limited income of both parties, did Myles present sufficient evidence to warrant a deviation from the child support guidelines under section 43-19-103(e) ("the age of the child, taking into account the greater needs of older children"). Like in *Thomas*, under the facts of this case, JDM's traveling team was not a school-affiliated extracurricular activity, and Lewis was not obligated to pay for it. Accordingly, we affirm

24

the chancery court's order that does not require Lewis to pay for JDM's expenses to participate in the traveling team.

¶40. However, we note that the chancery court stated it was not ordering Lewis to pay for the child's extracurricular activities "at this time." Our holding today is limited to the facts presented at the time of the hearing, among them that Myles had unilaterally chosen to enroll the child in private school over Lewis's objection, without any proof of the child needing such schooling for educational, mental, or physical purposes. Nor were there sufficient facts presented concerning the traveling team to justify a deviation from the child support guidelines. Should Myles present such proof on remand or, in the future, should the circumstances of the parents or the child change, Myles may seek a modification of the chancery court's order and raise this issue again at that time.

## V. Whether the chancery court erred in failing to award Myles attorney's fees.

¶41. At trial, Myles requested reimbursement from Lewis of the $1,200 attorney's fee that she had incurred in filing this action. The chancery court made no factual finding on the issue and simply ruled that each party would pay his or her own attorney's fees. On appeal, Myles argues that the chancery court erred in not requiring Lewis to pay her attorney's fees.

¶42. In paternity actions, prevailing parties are entitled to a reasonable attorney's fee by statute. Mississippi Code Annotated section 93-9-45 (Rev. 2021) provides:

> If the court makes an order of filiation, declaring paternity and for the support and maintenance, and education of the child, court costs, including the cost of the legal services of the attorney representing the petitioner, expert witness fees, the court clerk, sheriff and other costs shall be taxed against the defendant.

After citing the statute in *Dobbins v. Coleman*, 930 So. 2d 1246, 1251 (¶25) (Miss. 2006), the Mississippi Supreme Court held that "while the awarding of attorney's fees and costs appears automatic pursuant to the statute, we have held that those fees must be reasonable." Moreover, the party seeking fees must present proof of the reasonableness of the amount sought. For example, in *Dobbins*, the mother of the child who sued to establish the father's paternity submitted an "Attorney's Report," itemizing the charges and expenses for the case, as well as affidavits from two attorneys practicing in the county as to the usual and customary fees charged in the area. *Id*. The supreme court found this to be substantial evidence to support the reasonableness of the chancellor's award of attorney's fees and affirmed. *Id*. at 1252 (¶27).[15]

¶43. In *Smith v. Williams*, 199 So. 3d 705, 709-10 (¶15) (Miss. Ct. App. 2016), we affirmed a chancellor's award of attorney's fees to the mother (albeit not as much as she claimed she incurred). *Id*. at 710 (¶16). In that case, Smith filed an action to adjudicate Williams as the father of her child born out of wedlock. *Id*. at 706 (¶3). In addition to support and other special expenses, Smith asked for payment of her attorney's fees. *Id*. at 707 (¶4). When the chancellor awarded only $1,000 for fees, Smith appealed and pointed out that Williams had contributed to "protracted litigation" lasting five years, by requesting DNA testing, refusing to cooperate in the scheduling of the test, filing motions, and failing to respond to discovery. *Id*. at 709 (¶14). However, the affidavit concerning her fees that

_____

[15] In *Daniels v. Bains*, 967 So. 2d 77, 82 (¶16) (Miss. Ct. App. 2007), we pointed out that the *Dobbins* opinion clarified that in paternity actions where attorney's fees are awarded pursuant to section 93-9-45, the court should not rely on the factors for awarding attorney's fees set out in *McKee v. McKee*, 418 So. 2d 764 (Miss. 1982), a divorce case.

Smith's attorney gave to the chancellor in chambers did not make it into the record. *Id.* at (¶13). We noted the problem of not having this information in the record, but we also noted that the chancellor had encouraged one of the mother's attorneys not to press the issue. *Id.* at 710 (¶16). Because the chancellor had entered an order of filiation and support, we cited the statute and held that Smith was nonetheless entitled to a reasonable attorney's fee and affirmed the chancellor's award. *Id.* at 710 (¶16).

¶44. In the case at hand, although Myles may have been entitled to attorney's fees under the statute, she failed to present any evidence that the amount she sought, $1,200, was reasonable. There is no affidavit or testimony from her attorney for how this amount was calculated (the hours worked or the hourly fee charged) and no affidavits from other attorneys concerning the fees customarily charged by attorneys in the area. The burden was on Myles to present the evidence needed to establish not only her claim to a fee, but the reasonableness of the amount sought. Accordingly, because of the lack of evidence in the record, we find no error by the chancery court in not awarding Myles attorney's fees.

    **VI.    Whether Lewis is entitled to attorney's fees on appeal.**

¶45. In addition to briefing the issues raised by Myles, Lewis has filed a separate motion for an award of his costs and attorney's fees in defending the appeal. Lewis cites no authority in his motion. Rule 38 of the Mississippi Rules of Appellate Procedure provides, "[I]n a civil case if the Supreme Court or Court of Appeals shall determine that an appeal is frivolous, it shall award just damages and single or double costs to the appellee." M.R.A.P. 38. "An appeal is frivolous when the appellant has no hope of success." *In re Est. of Cole*,

27

256 So. 3d 1156, 1160 (¶13) (Miss. 2018); *see also McDowell v. Zion Baptist Church*, 203 So. 3d 676, 688 (¶49) (Miss. Ct. App. 2016). Further, the "inquiry into whether a party had any hope of success is an objective one to be exercised from the vantage point of a reasonable party in the litigant's position as it filed and pursued its claim." *Dean v. Slade*, 164 So. 3d 468, 474 (¶18) (Miss. Ct. App. 2014).

¶46. We reverse and remand in part for a recalculation of Lewis's net monthly income. Clearly and objectively, Myles's appeal was not frivolous. Accordingly, we deny Lewis's motion for attorney's fees.

## Conclusion

¶47. In summary, Myles was not procedurally barred from pursuing her appeal. Because we find that the chancery court abused its discretion by ignoring critical evidence in the record concerning Lewis's income and expenses, we reverse its determination of Lewis's child support obligation. We remand for the chancery court to recalculate Lewis's gross and net monthly personal income and calculate the amount of past and future child support he should pay. On remand, the chancery court should also specifically address the premium for the child's medical insurance and determine the obligation of each party for its payment. We affirm the chancery court's determination that Lewis is not required to pay for JDM's private school tuition or fees, for her extracurricular fees, or for her participation in the traveling team at this time. Further, we hold that the chancery court did not err in refusing to order Lewis to pay Myles's attorney's fees. Finally, we deny Lewis's motion for attorney's fees on appeal.

¶48.   **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**